UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION


Stacey Orlandi,                                               Case No. 3:20-cv-2237

                        Plaintiff,

        v.                                                    MEMORANDUM OPINION
                                                                   AND ORDER

Jonathan M. Osborne, et al.,

                        Defendants.

## I.     INTRODUCTION

Through this action, Plaintiff Stacey Orlandi asserts two breach of contract claims and a

claim for violation of the Employee Retirement Income Security Act ("ERISA").  (Doc. No. 42).

Defendants and Orlandi filed dueling dispositive motions seeking judgment in their favor on each of

these claims, (Doc. Nos. 50, 51, and 52), and dueling opposition briefs.  (Doc. Nos. 54, and 55).

The parties also filed joint stipulations that would govern my consideration of their dueling

dispositive motions.  (Doc. No. 47).  I adopted these stipulations, (Doc. No. 49), and apply them in

my analysis and conclusion below.

For the reasons stated below, Defendants are granted judgment of all claims.[1]

---

[1] Defendants also filed a motion to file a sur-reply, (Doc. No. 56), which Orlandi opposed.  (Doc.
No. 57).  Because the arguments made in the sur-reply are irrelevant to my analysis, I deny the
motion as moot.

## II.    BACKGROUND

On October 1, 2018, Defendant Marathon Petroleum Corporation ("MPC") acquired Andeavor.  Prior to that time, Virent, Inc. was a wholly owned subsidiary of Andeavor, and Orlandi was Virent's Chief Executive Officer.

As the CEO of Virent, Orlandi was a "Participant" in the Andeavor Executive Severance and Change in Control Plan (the "CIC Plan").  (Doc. No. 50-14).  And through her employment at Virent, she was also a "Participant" in the Andeavor 2011 Long-Term Incentive Plan (the "LTI Plan"), (Doc. No. 50-21), and subject to the 2018 Virent Incentive Compensation Program (the "VICP").  (Doc. No. 50-27).

Following the October 2018 acquisition, Orlandi resigned and sought to claim the Change in Control benefit under the CIC Plan.  Her claim to these benefits was denied by the Plan Administrator, Defendant Jonathan Osborne.  Orlandi then filed this action, alleging she is due Change in Control benefits under the CIC Plan and the LTI Plan as well as a bonus under the VICP. More specifically, she states three claims: (1) an ERISA violation for denial of benefits under the CIC Plain; (2) breach of contract for denial of benefits under the LTI Plan; and (3) breach of contract for failure to pay her a VICP bonus in 2018.  (*See* Doc. No. 42).

### A.    Relevant Language in Controlling Documents

The CIC Plan provides that:

> Each Participant is eligible to receive a Change in Control Benefit if, within the two-year period following a Change in Control, such Participant's employment with the Company or a Subsidiary is terminated by reason of (i) involuntary termination other than for Cause or by reason of death, or (ii) voluntary termination by the Participant for Good Reason.

(Doc. No. 50-2 at 7).  There is no dispute that MPC's acquisition of Andeavor was a "Change in Control."

2

Similarly, "[t]he Parties stipulate that a termination of employment by Plaintiff on account of 'Good Reason' as defined in the LTI Awards is a condition that, if met under the LTI Awards and the LTI Plan, will result in Plaintiff having damages with respect to each LTI Award." (Doc. No. 49 at 2; *see also* Doc. Nos. 50-21, 50-22, 50-23, 50-24, 50-25, and 50-26).

Under the CIC Plan and the LTI Awards,

"Good Reason" means the occurrence of any of the following:

(a) without Participant's express written consent, the assignment to Participant of any duties inconsistent with the employment of Participant immediately prior to the Change in Control, or a significant diminution of Participant's positions, duties, responsibilities and status with the Company from those immediately prior to a Change in Control or a diminution in Participant's titles or offices as in effect immediately prior to a Change in Control, or any removal of Participant from, or any failure to reelect Participant to, any of such positions;

…

(c) the failure by the Company to continue benefits, including but not limited to, 40l (k), pension, life insurance, and health plans, substantially equal in value, in the aggregate, to those in which Participant is participating or is eligible to participate at the time of the Change in Control except as otherwise required by the terms of such plans as in effect at the time of any Change in Control;

(d) the failure by the Company to continue in effect any incentive plan or arrangement in which Participant is participating at the time of a Change in Control (or to substitute and continue other plans or arrangements providing the Participant with substantially similar benefits), except as otherwise required by the terms of such plans as in effect at the time of any Change in Control; [or]

…

(f) any failure by the Company to obtain the assumption of this Agreement by any successor or assign of the Company[.]

(Doc. No. 50-2 at 5-6; Doc. No. 50-22 at 6; Doc. No. 50-23 at 8; Doc. No. 50-25 at 6-7; and Doc. No. 50-26 at 5-6).[2]

---

[2] Although the definition of "Good Reason" is not specifically in the Restricted Stock Units award granted to Plaintiff under the LTI Plan on April 3, 2017, (*See* Doc. No. 50-24), no party contends a different definition might apply to this Award. Instead, the parties agree that the CIC Plan and the LTI Awards provide the same definition for "Good Reason." (*See* Doc. No. 50-1 at 9-10; Doc. No. 52 at 13-14).

Like the LTI Awards, the VICP also incorporates the CIC Plan.  Under the VICP, "ineligible employees[s]" include "[e]mployees who separate from the Virent prior to the VICP payout date (unless they meet criteria outlined in Additional Eligibility Requirements section below)."  (Doc. No. 50-27 at 3-4).  One of the "criteria outlined in Additional Eligibility Requirements" is that "in-active employees . . . [m]ust have terminated and received severance under the Andeavor Severance Plan [(the CIC Plan)] on or after July 1 of the performance year."  (*Id.* at 4).

**B.** **Factual Background**

On September 28, 2018, MPC Human Resources Consultant Darren Black sent Orlandi a letter stating:

> As you are aware, there has been intensive planning for the final merger and integration of operations between Marathon Petroleum Corporation and Andeavor, anticipated to occur on October 1, 2018.  A significant part of that planning has been to determine a final organizational structure for the combined company.
>
> As part of the organizational changes taking place to integrate the two companies, we will be evaluating your role in the coming months.  During this time, your employment will continue at your current salary and position.  We expect that this evaluation period will continue for up to a 12-month period.
>
> At the conclusion of this evaluation, if you are offered a new role within the organization or offered to continue in your current role, you will be requested at that time, in consideration for such offer, to waive your rights to payments or benefits under the Andeavor Executive Severance and Change in Control Plan ("Plan"), and your rights to accelerated vesting of Andeavor equity-based awards, in the event of a resignation by you due to "Good Reason."  MPC will continue to recognize your eligibility for change in control severance benefits under the Plan and Andeavor equity-based awards (as converted to MPC equity-based awards) for involuntary termination by MPC without "Cause".  Also, during this evaluation period, your rights under the Plan and outstanding Andeavor equity-based awards will continue in effect.
>
> Your ongoing contribution and patience during this evaluation period are greatly appreciated.  We look forward to you joining MPC and are confident you will be instrumental in helping us achieve our business goals.

(Doc. No. 50-7).

4

Orlandi apparently responded to this transition letter by indicating her intent to resign and request benefits under the "Good Reason" provision of the CIC Plan.  Two weeks after the September 28, 2018 transition letter was sent, on October 16, 2018, Black sent Orlandi an email referencing and preliminarily rejecting her request.  (Doc. No. 50-9 at 2).  Specifically, Black stated, in part:

> I wanted to follow up on our discussion last week with an update.  We have looked into your request to exercise the "Good Reason" provision in the Andeavor Executive Severance and Change in Control Plan with counsel.  If you were to voluntarily terminate at this time, we do not believe that you would qualify for change in control benefits under the plan.  This is because your position has not changed.  To trigger the "Good Reason" provision, you would need to have experienced a "significant diminution" in your position, duties, responsibilities and status with the Company or a diminution in your title or office.  While I understand that you have a different perspective on this issue, we do not believe this has occurred.  You report directly to Ray Brooks, EVP, and your role has not changed.  Please note that if you decide to resign, and if you do not receive benefits under the plan, you can file a claim and appeal any denial of benefits under the claims and appeals process outlined in the plan.

(*Id.*).

> Undeterred, Orlandi responded:
>
> I think, and have been advised, that "good reason" exists not only because there has been a significant diminution in my position, duties, responsibilities and status (the now temporary nature of my position and the change in the level of my reporting structure among other things), but also because my transition letter provides that I will have to give up the "good reason" trigger for change in control benefits if the company decides to continue my employment after the contemplated evaluation period.  That change to my rights under the plan triggers at least two other elements of the "good reason" definition.  But that's perhaps a discussion for another day.  What I want to refocus on is how the proposed transition can work for both the company and me.
>
> As you know, in addition to the items specified above, I am concerned is that I am being asked to work up to 12 months with an uncertain future and timeline for decision making.  From a professional perspective, this means I am effectively putting my career on hold while Marathon decides the future of Virent and my employment.
>
> When we last spoke, you asked me what would work for me.  My proposal is that I will:

- work a 12 week transition period ending on Jan 15, 2019,
- lead and support the efforts for Marathon to independently evaluate Virent's business case and technical readiness for commercialization,
- assist in identifying and transitioning my accountabilities and external relationships to a suitable successor,
- manage the strategic partnerships to minimize any impact of my exit.

Per my earlier meetings with Ray, he has proposed the end of 2018 to review the results from the independent evaluation of the Virent business case for a first commercial plant and set a forward direction for Virent. I believe this revised transition timing creates a win-win approach that acknowledges the current refining integration and TAR priorities Ray is dealing with, our collective goal to create a forward path for Virent, and my desire to move forward with my career.

If agreed, at the conclusion of this 12 week transition period, I will receive the Change-in-Control benefits, payments, and accelerated Andeavor equity-based awards as specified in the Andeavor Executive Severance and Change-in-Control Plan.

(*Id.* at 1).

On October 26, 2018, Orlandi sent Black a follow-up email asking that he respond to her proposal prior to her meeting the following week with Ray Brooks, where they planned "to discuss next steps in evaluating the Virent opportunity and establishing the future pathway." (Doc. No. 50-10). And on October 29, 2018, Black provided the requested response:

The response to your proposal is consistent with past messaging. Your importance to Virent's mission continues to be recognized. We would like for you to continue in the role without the constraints of a defined transition. Your role is not considered to be temporary and therefore the proposed 12 week transition is not acceptable. We truly value you as an employee and hope that you can work with Ray to make the Virent CEO role fulfilling.

(*Id.*).

Even though her 12-week transition proposal was rejected, on January 2, 2019, Orlandi "resign[ed] from [her] position as CEO of Virent, Inc effective Jan 15th, 2019," and invoked the "Good Reason" provision. (Doc. No. 50-5). To her January 2, 2019 resignation email, Orlandi attached a memorandum entitled "Rationale for 'Good Reason'" and attached to that memorandum exhibits referenced therein. (*See* Doc. Nos. 50-5 & 50-6).

6

In her "Rationale for 'Good Reason'" memorandum, Orlandi alleged:

"Good Reason" exists not only because there is a significant diminution of my position, duties, responsibilities and status (the temporary nature of my position, the change in level of my reporting structure) and title, but also because my transition letter (attached) provides that I will have to give up the "Good Reason" trigger for change in control benefits if the company decides to continue my employment after the contemplated evaluation period.  In addition, the transition letter itself triggers other elements of the "Good Reason" definition.

(Doc. No. 50-6 at 1).  She then identified evidence that she believed supported her "Good Reason" argument regarding her post-merger role and status:

- In the Disclosure Statement exiting Andeavor executives received in connection with their Plan payments, my role is listed under the column "Ages of Employees Selected" for termination with a notation that I was "selected for termination, but will remain employed for a period following October 1, 2018 to assist transition and other efforts."  Nothing could be more clear that my role was temporary; I was to transition until terminated.  This is in direct conflict to what Darren Black wrote in his response to my Oct 17th offer for a shorter transition of 12 weeks.  He stated that "Your role is not considered to be temporary and therefore the proposed 12 week transition is not acceptable" (attached).
- To my knowledge, all of my peers at VP and above who were asked to stay on in permanent roles were required to waive the "Good Reason" protection in the Plan, and those who declined received Plan benefits.  I was not given that option.  I am aware of others in my peer group who were asked to stay on in a transitional role and given definite transition dates.  I was not given that option.  I am unaware of anyone else who was asked to stay on in a transitional role of an uncertain duration.
- Consistent with the temporary nature of my employment, my role was absent from the 9/24/18 organizational announcement and my level (VP or other) was never confirmed to me.  This was in the context of other VP level and above Andeavor executives receiving offers where some VP's received diminished titles of Director or Manager (organizational announcement attached).  There have been two additional Refining organizational announcements (10/29/18 and 12/12/18) and my position in the new organization still hasn't been announced.
- Reporting level of the Virent Management Committee (VMC) has been diminished.  At Andeavor, 3 of the members of the VMC were direct reports to the CEO (2 EVP's, 1 SVP).  At the Dec 12th, 2018 review meeting with Ray Brooks the new VMC membership was confirmed and consists of 1 EVP, 1 SVP and 2 VP's from MPC, none of whom are direct reports to the CEO of MPC.
- In the MPC online system, I am listed as a "MPC transitioning employee" without my title of CEO, Virent.  (screenshot attached).

7

- In the last week of September, I was invited to join a call to discuss the Refining leadership organization where Ray stated that all of the roles in his area had been confirmed.  My name and role were not announced then and have never been announced within MPC.
- MPC held a leadership meeting in November with top leaders including not only Refining EVP direct reports but also many of the Refinery Managers. Although I was one of the more senior VP's in Andeavor, I was not invited to the MPC leadership meeting.

(Doc. No. 50-6 at 1-2).

According to Orlandi, "Mr. Brooks replied that he disagreed and . . . forwarded [her] resignation notice and attachments to [Reed Zimmer] as the Plan Administrator for consideration as a claim for the Change in Control Benefit under the Plan."  (Doc. No. 50-13 at 1).  On January 11, 2019, Orlandi emailed those documents to Zimmer herself and explained to him why she believed her resignation was for "Good Reasons," stating:

As you know, I resigned my position as CEO of Virent, Inc. effective January 15th, 2019.  Prior to my resignation, I had several conversations with Ray Brooks and Darren Black about the nature of my role following the Andeavor/Marathon Petroleum ("MPC") merger.  I explained to both why I felt my offer letter, combined with the governance structure of Virent in MPC, triggered the "Good Reason" requirement for receipt of the "Change in Control Benefit" under the Andeavor Executive Severance and Change in Control Plan (the "Plan").  I further explained that I was willing to stay for an agreed-upon transition period while MPC evaluated Virent and how it might fit into the company's future plans, but the contemplated 12-month period with an uncertain future was problematic.  Ultimately, the company refused to consider a defined evaluation/transition period.  Even after the Virent review meeting on Dec 12th, when the decision was made to continue with Virent's 2019 business plan, there was no mention of the evaluation period of my role and my future.

…

The attachment to my resignation notice titled "Rationale for 'Good Reason'" sets out why my resignation is for "Good Reason" under element (a) of the definition. In addition, I believe my resignation is for "Good Reason" under elements (c), (d), and (f) of that definition for the following reasons.

- Elements (c) and (d) provide that "Good Reason" includes the "failure by the Company to continue benefits . . .substantially equal in value, in the aggregate," to those in which I participated in at the time of the Change in Control or the "failure by the Company to continue in effect any incentive

8

plan or arrangement" in which participated at the time of a Change in Control "or to substitute and continue other plans or arrangements providing the Participant with substantially similar benefits."  Plan § 1.15(c), (d).

- The Plan is a "benefit" and specifically an "incentive plan or arrangement" of Andeavor.  In that regard, see, for example, the Preamble.  ("The Plan is designed to provide a benefit that will meet the objectives described above."  "The Plan . . . is intended to qualify as an unfunded plan maintained primarily for the purpose of providing benefits for a select group of management and highly compensated employees of the Company and its Subsidiaries.")

- The Plan defines "Company" in relevant part as Andeavor "or any successor thereto."  Plan § 1.12.  MPC is a successor to Andeavor.

- My offer letter expressly provides that after an evaluation period of uncertain duration, if MPC decides to offer me a new or the same role, I would be required to "waive [my] rights to payments or benefits under the Andeavor Executive Severance and Change in Control Plan . . . in the event of a resignation by [me] due to 'Good Reason'" in order to accept the offer. The Plan does not contemplate or allow for such a requirement and that alteration to the Plan obviously does not provide a benefit "substantially equal" or "substantially similar" to that under the Plan.

- Accordingly, that requirement in my offer letter triggers elements (c) and (d) of the definition of "Good Reason" because it is a failure by the Company to continue the benefits under the Plan in effect on the date of the Change in Control.

- For the same reason, element (f) of the definition of "Good Reason" is triggered.  The Plan cannot be said to have been assumed by MPC if MPC can reduce a basic benefit under it as a condition of continued employment.

- That this reduction in benefits under the Plan was conditional based on whether MPC decided to continue my employment after an evaluation period of uncertain duration does not change the fact that the requirement that I do so under certain circumstances that might exist at some uncertain time in future is not the same or a similar benefit as I enjoyed under the Plan at the time of the Change in Control.  One of the significant benefits I enjoyed under the Plan at the time of the Change in Control was the certainty of knowing that if my employment continued after the merger, I would have the "Good Reason" protection for the next two years.  That benefit goes to the very reason the Plan was adopted: To "reduce uncertainty to select executives of the Company and its Subsidiaries in the event of certain fundamental events involving the control or existence of the Company."  See Plan, Preamble.

- To my understanding, the company has interpreted the Plan as I suggest in virtually identical circumstances.  I understand that most Andeavor employees at the VP level and above who received offer letters from Marathon were required to waive the "Good Reason" trigger for the Change in Control Benefit under the Plan in order to accept the offer.  I further understand that employees who received that type of offer but declined the

9

> offer received the Change in Control Benefit.  The only difference in my situation is that this requirement would be imposed after an evaluation period if MPC decided to continue my employment.  As noted above, that difference is immaterial.  Indeed, Mr. Brooks described the difference in my offer letter from other offer letters as MPC's desire to "kick the can down the road."  Consistency thus requires that I be granted the Change in Control Benefit.

(Doc. No. 50-13 at 1-2).

As the "Plan Administrator" at the time, Orlandi's claim landed on Osborne's desk, and he was accorded "sole and absolute discretion" to determine "whether a termination of employment shall be for Cause or Good Reason."  (Doc. No. 50-2 at 7).  At the time the subject decisions were made, Osborne was MPC's Director of Compensation and Benefits.  (Doc. No. 50-4).

On February 28, 2019[3], Orlandi was sent a letter denying her claim to the Change in Control benefit and specifically rejecting all of Orlandi's "Good Reasons" arguments.  (Doc. No. 50-14).  The letter was signed by Osborne but drafted by the MPC Legal Department.  (Doc. No. 50-29 at 19).  Osborne admitted that prior to receiving the draft from the Legal Department, he had no discussion with them about the details of what the letter should say and testified, "I can remember one conversation with Lisa that this was in the process.  But nothing in detail was discussed."  (*Id.* at 20).  Still, Osborne recalled that after receiving the draft, he made changes – "probably . . . three or four" – but did not remember the substance of those changes and thought, "It would be just, probably, more along the lines of clarification."  (*Id.* at 19-20).  Ultimately, despite this being a joint effort, when faced with a question regarding word choice, Osborne maintained he "would have" chosen the word because "the letter is from me."  (*Id.* at 20).

Orlandi appealed the denial with the assistance of counsel, but her appeal consisted primarily of the same arguments that were previously rejected.  (*See* Doc. Nos. 50-15, 50-16, 50-17, 50-18, and

---

[3] All appear to agree that this letter should have been dated February 28, 2019, rather than February 28, 2018.  (*See* Doc. No. 50-29 at 19).  The scrivener's error is not relevant here.

50-19).  And on July 31, 2019, those arguments were rejected again, and her appeal was denied. (Doc. No. 50-20).  Again, the denial letter was signed by Osborne, but he admits it was drafted by MPC's Legal Department and did not "recall telling counsel what should be incorporated into the letter."  (Doc. No. 50-29 at 21-22).  And again, Osborne alleges he made changes to the letter but does not recall what those changes were.  (*Id.*).

### III.    ERISA CLAIM

Both Orlandi and Defendants move for judgment on the administrative record of Orlandi's ERISA benefits denial claim.

"ERISA regulates plan administrators' coverage-related decisonmaking and provides a right of action for those seeking to challenge coverage denials."  *T. E. v. Anthem Blue Cross & Blue Shield*, 165 F.4th 971, 979 (6th Cir. 2026) (citing 29 U.S.C. § 1001 *et seq.*).

"[A] denial of benefits challenged under [ERISA] § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  "If the plan delegates discretion, we review the administrator's benefits decision under a unique form of 'arbitrary-and-capricious' review."  *Goodwin v. Unum Life Ins. Co. of Am.*, 137 F.4th 582, 588 (6th Cir. 2025).

"Nonetheless, even when the plan documents confer discretionary authority on the plan administrator, when the benefits decision 'is made by a body other than the one authorized by the procedures set forth in a benefits plan,' federal courts review the benefits decision *de novo*."  *Shelby Cnty. Health Care Corp. v. Majestic Star Casino*, 581 F.3d 355, 365 (6th Cir. 2009) (quoting *Sanford v. Harvard Indus., Inc.*, 262 F.3d 590, 597 (6th Cir. 2001)).  This is because "[w]here a plan administrator does not make the benefits decision, the plan administrator has not exercised its discretionary authority, and therefore a deferential standard of review is not justified."  *Id.*

11

The parties do not dispute that the CIC Plan granted Osborne, as the Plan Administrator, sole discretionary authority to interpret the terms of the Plan and determine Orlandi's eligibility for benefits.  But Orlandi suggests Osborne did not exercise that discretion and instead "abdicated of all his powers and the process of analyzing Ms. Orlandi's claim to MPC's legal department."  (Doc. No. 52 at 30; *see also* Doc. No. 55 at 21).

"[T]o determine the appropriate standard of review applicable to the decision to deny benefits, the district court [is] required to resolve the factual issue of 'who actually made the benefit determination.'"  *Shelby Cnty. Health Care Corp.*, 581 F.3d at 365 (quoting *Sharkey v. Ultramar Energy Ltd., Lasmo plc, Lasmo (AUL Ltd.)*, 70 F.3d 226, 229 (2d Cir. 1995)).  As such, at this juncture, I would generally undertake this fact-intensive determination to answer that question.  But in this case, I conclude this potentially complicated analysis is not necessary because Orlandi's claim would fail under even the *de novo* standard of review.

When reviewing the merits of the plan administrator's decision *de novo*, the district court considers only "the evidentiary materials contained in the administrative record" and applies the *de novo* standard "to the factual determinations as well as to the legal conclusions of the plan administrator." *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 613, 619 (6th Cir. 1998) (concurring, Gilman, J.); *Moore v. Lafayette Life Ins. Co.*, 458 F.3d 416, 430 (6th Cir. 2006) (adopting the two-step process found in Judge Gilman's *Wilkins* concurrence).

And "in determining whether benefits were due under the Plan, the starting point is the language of the Plan itself." *Farhner v. United Transp. Union Discipline Income Prot. Program*, 645 F.3d 338, 343 (6th Cir. 2011); *see, e.g., Firestone*, 489 U.S. at 115 ("[T]he validity of a claim to benefits under an ERISA plan is likely to turn on the interpretation of terms in the plan at issue.").

Because the parties agree the CIC Plan is governed by ERISA, "federal common law rules of contract interpretation" apply. *Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 556 (6th Cir. 1998) (en

12

banc).  I must "interpret the Plan's provisions according to their plain meaning, in an ordinary and popular sense, … and [i]n applying this plain meaning analysis, [I] 'must give effect to the unambiguous terms of an ERISA plan.'" *Id.* (quoting *Lake v. Metro. Life Ins. Co.,* 73 F.3d 1372, 1379 (6th Cir.1996)) (additional internal citations omitted).  "[A] policy is ambiguous only if it 'is susceptible to multiple reasonable interpretations, not just because clever lawyers can disagree over the meaning of terms.'" *Fulkerson v. Unum Life Ins. Co. of Am.*, 36 F.4th 678, 681 (6th Cir. 2022) (quoting *Clemons v. Norton Healthcare Inc. Ret. Plan*, 890 F.3d 254, 269 (6th Cir. 2018)).

Again, pursuant to the CIC Plan:

Each Participant is eligible to receive a Change in Control Benefit if, within the two-year period following a Change in Control, such Participant's employment with the Company or a Subsidiary is terminated by reason of: (i) involuntary termination other than for Cause or by reason of death, or (ii) voluntary termination by the Participant for Good Reason.

(Doc. No. 50-2 at 7).  Relatedly,

"Good Reason" means the occurrence of any of the following:

(a) without Participant's express written consent, the assignment to Participant of any duties inconsistent with the employment of Participant immediately prior to the Change in Control, or a significant diminution of Participant's positions, duties, responsibilities and status with the Company from those immediately prior to a Change in Control or a diminution in Participant's titles or offices as in effect immediately prior to a Change in Control, or any removal of Participant from, or any failure to reelect Participant to, any of such positions;

…

(c) the failure by the Company to continue benefits, including but not limited to, 40l (k), pension, life insurance, and health plans, substantially equal in value, in the aggregate, to those in which Participant is participating or is eligible to participate at the time of the Change in Control except as otherwise required by the terms of such plans as in effect at the time of any Change in Control;

(d) the failure by the Company to continue in effect any incentive plan or arrangement in which Participant is participating at the time of a Change in Control (or to substitute and continue other plans or arrangements providing the Participant with substantially similar benefits), except as otherwise required by the terms of such plans as in effect at the time of any Change in Control;

13

… or

(f) any failure by the Company to obtain the assumption of this Agreement by any successor or assign of the Company[.]

(Doc. No. 50-2 at 5-6).

Since initially making her claim to CIC benefits, Orlandi has maintained that circumstances existed that triggered sections (a), (c), (d), and (f) of the "Good Reason" provision.  (*See* Doc. Nos. 50-6, 50-13, 50-16, 50-19, 52, and 55).  While she cites to evidence she believes support her position, she fails to square that evidence with the plain language of the CIC Plan.

### A.      Sections (c), (d), & (f)

In support of her argument that sections (c), (d), and (f) were triggered, Orlandi relies exclusively on the September 28, 2018 offer letter, which informed her, in part:

> As part of the organizational changes taking place to integrate the two companies, we will be evaluating your role in the coming months.  During this time, your employment will continue at your current salary and position.  We expect that this evaluation period will continue for up to a 12-month period.
>
> At the conclusion of this evaluation, if you are offered a new role within the organization or offered to continue in your current role, you will be requested at that time, in consideration for such offer, to waive your rights to payments or benefits under the Andeavor Executive Severance and Change in Control Plan ("Plan"), and your rights to accelerated vesting of Andeavor equity-based awards, in the event of a resignation by you due to "Good Reason."  MPC will continue to recognize your eligibility for change in control severance benefits under the Plan and Andeavor equity-based awards (as converted to MPC equity-based awards) for involuntary termination by MPC without "Cause".  Also, during this evaluation period, your rights under the Plan and outstanding Andeavor equity-based awards will continue in effect.
>
> Your ongoing contribution and patience during this evaluation period are greatly appreciated.  We look forward to you joining MPC and are confident you will be instrumental in helping us achieve our business goals.

(Doc. No. 50-7).

Orlandi specifically faults the sentence informing her that if MPC offered her a job after the up-to-12-month evaluation period, a condition of that job offer would be that she waive her rights

14

and benefits under the Plan to resign for "Good Reason." Orlandi alleges that this impending

condition to continued employment triggered sections (c), (d), and (f) of the "Good Reason"

provision.

> Defendants respond:
>
> Osborne considered and rejected [this] theory: a "mere reference in the letter to a possibility of a future request for a waiver of rights under the Plan did not by itself constitute a change to or the failure to continue any benefits under the Plan." ([Doc. No. 50-20 at 6].) In any event, Mr. Osborne concluded that "[t]his event did not occur—MPC did not ask Ms. Orlandi to waive, and she did not waive, any right under the Plan." (*Id.*)

(Doc. No. 54 at 11).

Orlandi maintains "it was more than a mere possibility": "The only speculation represented

is whether she would continue as an employee. Not whether she would have to waive her rights."

(Doc. No. 55 at 12). She also notes that, "'[t]o [her] knowledge, all of [her] peers at VP and above

who were asked to stay on in permanent roles were required to waive the 'Good Reason' protection

in the Plan, and those who declined received Plan benefits.'" (*Id.* (quoting Doc. No. 50-6 at 1)).

While Orlandi is not wrong about what the letter says, unlike her peers who *were* offered a

job and asked to waive benefits, she was not. There is no dispute that at the time of her resignation,

she had not been offered a job and asked to waive benefits. But Orlandi alleges that because "this

requirement would be imposed after an evaluation period if MPC decided to continue [her]

employment[,] the difference is immaterial." (Doc. No. 50-13 at 2). This argument finds no support

in the plain language of the CIC Plan.

Under the CIC Plan, "'Good Reason' means the occurrence of any of the following . . . ."

(Doc. No. 50-2 at 5). "[I]n an ordinary and popular sense," *Perez.*, 150 F.3d at 556, "the occurrence

of any of the following" means that "any of the following" **actually occurred**. It does not mean

that "any of the following" could occur or even that "any of the following" *would* occur. Put simply,

"Good Reason" does not mean the inevitable "occurrence of any of the following."  It means "the occurrence of any of the following."  (Doc. No. 50-2 at 5).

Even if a request to waive benefits as a condition of continued employment constituted a "Good Reason" under sections (c), (d), or (f), such a request was not made of Orlandi.  A possible future request to waive benefits was not a "Good Reason" for Orlandi to resign.

Rejecting Orlandi's primary argument, I turn to her secondary: that section (f) was triggered because:

> The Severance Plan cannot be said to have been assumed by MPC if MPC can reduce a basic benefit under it as a condition of continued employment.  One of the significant benefits Ms. Orlandi enjoyed under the Severance Plan at the time of the Change in Control was the certainty of knowing that if her employment continued after the merger, she would have the "Good Reason" protection for the next two years.  That benefit goes to the very reason the Severance Plan was adopted: to "reduce uncertainty to select executives of the Company and its Subsidiaries in the event of certain fundamental events involving the control or existence of the Company."

(Doc. No. 52 at 27) (removing emphasis).  The plain language of the CIC Plan also defeats this argument.

First, as it relates to section (f), Defendants are correct in suggesting Orlandi's argument falls outside the scope of the plain language of section (f), which is triggered when there is an "occurrence of . . . any failure by the Company to obtain the assumption of this Agreement by any successor or assign of the Company."  (Doc. No. 50-2 at 6).  As Defendants allege, section (f) would be triggered only if MPC failed to ensure a future successor assumed the Plan, something Orlandi does not allege occurred.  (*See* Doc. No. 54 at 11).

Second, I must reject Orlandi's suggestion that because her employment continued after the merger, she was entitled to a "benefit" under the CIC Plan of the certainty of two years of continued employment with "Good Reason" protection.  The CIC Plan acknowledges that "within the two-year period following a Change in Control," the Participant's employment could end not just by

16

reason of "voluntary resignation by the Participant for Good Cause," but also by "involuntary termination [by MPC] other than for Cause or by reason of death."  (Doc. No. 50-2 at 7).  Put otherwise, the CIC Plan did not give Orlandi the benefit of two years of continued employment (with or without "Good Reason" protection); it gave her the benefit of "Good Reason" protection for **a maximum** of two years.  The duration of this protection could be reduced to less than two years if, for example: twelve months after the merger, MPC offered Orlandi a permanent role on its terms (i.e., waiving "Good Reason" protection), Orlandi rejected that offer, and in response, MPC "involuntary[ily] terminate[d]" her and gave her the Change in Control benefit.  Because a full two years of "Good Reason" protection was not a benefit of the CIC Plan, MPC was not required to give Orlandi such a benefit to have assumed the CIC Plan.

Because the possibility that she would be asked to waive "Good Reason" protection as a condition of continued employment after the evaluative period was not a "Good Reason" for Orlandi to resign when she did, her claim to benefits under sections (c), (d), and (f) premised on this anticipated request must fail.

### B.    Section (a)

Orlandi also claims she was eligible to benefits under section (a) because there was "a significant diminution of [her] positions, duties, responsibilities and status with the Company from those immediately prior to a Change in Control or a diminution in [her] titles or offices as in effect immediately prior to a Change in Control."  (Doc. No. 50-2 at 5; Doc. No. 52 at 23).  But the plain language of the CIC Plan supports no such finding.

At the outset, I reject her claim that there was "a diminution in [her] titles or offices."  (Doc. No. 50-2 at 5).  The only meaningful argument she makes on this front relates to the title of her alleged successor.  (*See* Doc. No. 52 at 26).  But the plain language of the CIC Plan provides that "'Good Reason' means the occurrence of . . . a diminution in **Participant's** titles or offices as in

17

effect immediately prior to a Change in Control."  (Doc. No. 50-2 at 5) (emphasis added).  Orlandi

is the "Participant," not her successor; only Orlandi's title is relevant.  After all, as a practical matter,

anything related to her alleged successor would have necessarily occurred after her resignation and

therefore, could not have given her "Good Reason" for it.  In any case, because Orlandi admits "she

nominally retained the title of CEO of Virent," (Doc. No. 52 at 25), and does not allege any

"occurrence of . . . a diminution in [her] . . . offices," Orlandi was not eligible for CIC benefits under

this clause of section (a).  (Doc. No. 50-2 at 5).

Remaining is Orlandi's assertion that her right to resign for "Good Reason" was triggered by

"the occurrence of . . . a significant diminution of [her] positions, duties, responsibilities and status

with the Company from those immediately prior to a Change in Control."  (Doc. No. 50-2 at 5).  In

support of this claim, she relies primarily on her belief that the up-to-12-month "'evaluative period' .

. . was itself a diminution of her 'positions, duties, responsibilities and status,'" (Doc. No. 52 at 32),

because during this time, her role was "temporary, transitional, and uncertain."  (*See id.* at 23-26).

Defendants dispute that her role was temporary, transitional, or uncertain.  But Defendants

also argue, that even if it was, "'expected duration of a position following a Change in Control is not

listed as a criterion under clause (a).'" (Doc. No. 50-1 at 18 (quoting Doc. No. 50-20 at 4)).

In turn, Orlandi does not dispute that "'duration' of position is not expressly listed in the

definition of 'Good Reason'" but contends that "duration" is baked into section (a) via the CIC

Plan's preamble, which provides:

> The principal objective of this Executive Severance and Change in Control Plan (the
> "Plan") is reduce uncertainty to select executives of the Company and its Subsidiaries
> in the event of certain fundamental events involving the control or existence of the
> Company as well as to provide a benefit in the event of an executive's termination of
> employment under certain conditions that are beyond the executive's control.

(Doc. No. 55 at 6 (quoting Doc. No. 50-2 at 3)).  With this, she alleges that by "[r]epresenting to

[her] that her position was subject to 'an evaluation period' of up to 12 months," MPC "increased

the uncertainty of [her] position," (Doc. No. 55 at 6-7), and thus, ran afoul of the CIC Plan's

objective "to reduce uncertainty."  (Doc. No. 50-2 at 3).  Neither the evidence Orlandi offers nor

the plain language of the CIC Plan supports such a conclusion.

First, as evidence of her claim that the evaluative period *increased* uncertainty to her, she

asserts:

> Ms. Orlandi did not have a place in the "final organizational structure" as of
> Marathon's September 28, 2018 letter, (Id.), her position was not announced over
> the next three months, (Ex. 15, ECF No. 50-16, PageID#:953 at 958), she was not
> invited to key meetings, (Ex. 15, ECF 50-16, PageID#:953 at 958), and Marathon
> told her that they wanted her to continue working "without the constraints of a
> defined transition" (Ex. 9, ECF No. 50-10, PageID#940) - this after she raised
> concerns about the "uncertainty" of her situation. (Ex. 8, ECF No. 50-9,
> PageID#:938)(*"I am concerned that I am being asked to work up to 12 months with an*
> *uncertain future and timeline for decision making.  From a professional perspective, this means I am*
> *effectively putting my career on hold while Marathon decides the future of Virent and my*
> *employment."*).

(Doc. No. 55 at 7).  But none of these points show that the 12-month "duration" of the evaluative

period increased uncertainty to her.  And to the extent she alleges uncertainty about her eventual

fate at MPC during those up-to twelve months ran afoul of the CIC Plan's objective, she finds no

support in the plain language of the CIC Plan.

It is true the "principal objective" of the CIC Plan was "to reduce uncertainty" for

Participants like Orlandi should an event like the merger here occur.  (Doc. No. 50-2 at 3).  But "to

*reduce* uncertainty" implies there may be uncertainty to be reduced.  And while uncertainty could be

reduced to zero, "to *reduce* uncertainty" is not "to *eliminate* uncertainty."  Put simply, while the

objective of the CIC Plan was "to reduce uncertainty," the CIC Plan did not *prohibit* uncertainty.  In

fact, the CIC Plan acknowledged that a Participant's fate with the Company could remain uncertain

for up to two years after a Change in Control and therefore, made Participants:

> eligible to receive a Change in Control Benefit if, **within the two-year period**
> **following a Change in Control**, such Participant's employment with the Company
> or a Subsidiary is terminated by reason of: (i) involuntary termination other than for

19

Cause or by reason of death, or (ii) voluntary termination by the Participant for
Good Reason.

(Doc. No. 50-2 at 7) (emphasis added).

I understand Orlandi's "desire to move forward with [her] career" at another job rather than
remaining uncertain for up to twelve months while performing her current one. (Doc. No. 50-9 at
1). But Orlandi identifies no part of the CIC Plan which would require MPC to eliminate all
uncertainty to her at the time of the merger or even within twelve months of it. And while I am to
"construe an ERISA plan with a view toward effectuating its general purpose," *Kolkowski v. Goodrich
Corp.*, 448 F.3d 843, 850 (6th Cir. 2006), I am "not permitted to rewrite contracts by adding
additional terms." *Perez*, 150 F.3d at 557.

The alleged "temporary, transitional, and uncertain nature of Ms. Orlandi's role at MPC"
during the up-to-12-month evaluative period was not itself a "Good Reason" for her to resign. Put
otherwise, to the extent the 12-month duration had *any* effect on her position, duties,
responsibilities, or status, it did not constitute "a **significant diminution** of Participant's positions,
duties, responsibilities **and** status with the Company from those immediately prior to a Change in
Control." (Doc. No. 50-2 at 5) (emphasis added).

Even if I considered the temporary duration of her role to diminish all of the four, Orlandi
claim to benefit under section (a) must fail because the evidence does not demonstrate "a
**significant** diminution of Participant's positions, duties, responsibilities **and** status with the
Company from those immediately prior to a Change in Control." (Doc. No. 50-2 at 5) (emphasis
added).

Fundamentally, Orlandi offers no evidence to demonstrate *any* diminution of her duties or
responsibilities, much less "a significant diminution." Throughout the administrative levels and in
her briefing here, Orlandi has made only passing references to her duties and responsibilities,
primarily in the context of her arguments that the "temporary, transitional, and uncertain" nature of

20

her role during the "evaluative period" significantly diminished all four.  Having rejected this general argument, all that remains of her claim regarding duties are:

1.) That Osborne did not investigate or determine the duties of Orlandi's alleged successor at Virent, (Doc. No. 52 at 20); and

2.) "there is no evidence in the administrative record that Ms. Orlandi was consulted about or participated in any decisions as to which employees would be retained vs. terminated in the merger – traditional duties of any CEO that were nonexistent in Ms. Orlandi's case during the transition." (Doc. No. 52 at 25) (emphasis removed).

Like the title of her alleged successor was irrelevant, so are her successor's duties.  The CIC Plan provides that "'Good Reason' means the occurrence of . . . a significant diminution of **Participant's** . . . duties . . . with the Company from those immediately prior to a Change in Control." (Doc. No. 50-2 at 5) (emphasis added).  Orlandi is the Participant.  And again, as a practical matter, anything regarding her successor would have necessarily occurred after her resignation and could not have given for "Good Reason" for it.

Her claim regarding the absence of evidence fares no better.  As Defendants assert, this is the first time Orlandi has raised this claim, and "[s]he cites no caselaw or authority in support of this notion." (Doc. No. 54 at 10).  Orlandi makes no attempt to rebut this argument or offer anything in support of her own.

As it stands, there is no evidence in the administrative record from which I could conclude MPC *made* any decision about Virent employees without consulting Orlandi because Orlandi herself did not offer such evidence at the administrative level.  Because Orlandi offered no such evidence or even raise this argument at the administrative level, it is no surprise that no rebuttal evidence was introduced into the administrative record.  As such, I reject Orlandi's argument that this absence of evidence shows any diminution of her duties, much less a significant one.

Because Orlandi has failed to demonstrate a significant diminution of her duties, she cannot show "a **significant diminution** of Participant's positions, duties, responsibilities **and** status with the Company from those immediately prior to a Change in Control."  (Doc. No. 50-2 at 5) (emphasis added).  Orlandi's resignation was not for a section (a) "Good Reason."

### C.    CONCLUSION

Under the plain language of the CIC Plan, no "Good Reason" had occurred at the time of her resignation.  Therefore, Osborne is entitled to judgment of the administrative record of Orlandi's claim, even without the benefit of "great deference" that would be afforded to him under arbitrary-and-capricious review.  *Autran v. Procter & Gamble Health & Long-Term Disability Benefit Plan*, 27 F.4th 405, 411 (6th Cir. 2022).  Osborne's motion for judgment on the administrative record of the ERISA claim is granted, (Doc. No. 50), and Orlandi's motion for the same is denied.  (Doc. No. 51).

## IV.    CONTRACT CLAIMS

Orlandi and Defendants each move for summary judgment of Orlandi's breach of contract claims.

Summary judgment is appropriate if the movant demonstrates there is no genuine dispute of material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  All evidence must be viewed in the light most favorable to the nonmovant, *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 390 (6th Cir. 2008), and all reasonable inferences are drawn in the nonmovant's favor.  *Rose v. State Farm Fire & Cas. Co.*, 766 F.3d 532, 535 (6th Cir. 2014).  A factual dispute is genuine if a reasonable jury could resolve the dispute and return a verdict in the nonmovant's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A disputed fact is material only if its resolution might affect the outcome of the case under the governing substantive law.  *Rogers v. O'Donnell*, 737 F.3d 1026, 1030 (6th Cir. 2013).

22

Even taking the evidence in the light most favorable to Orlandi, and drawing all reasonable inferences in her favor, there is no issue of material fact.  Both of Orlandi's breach of contract claims rise and fall on whether her resignation was for "Good Reason" as defined by the CIC Plan. Defendants are entitled to summary judgment of both claims.

First, the VICP provides that an employee is not eligible for a VICP bonus if they "separate[d] from the Virent prior to the VICP payout date (unless they meet criteria outlined in Additional Eligibility Requirements section below)."  (Doc. No. 50-27 at 3).  Orlandi does not dispute that she "separate[d] from the Virent prior to the VICP payout date."  (*See* Doc. No. 52 at 41).  But she contends she is still eligible for the VICP bonus because she meets the "Additional Eligibility Requirements" criteria that "in-active employees . . . [m]ust have terminated and received severance under the Andeavor Severance Plan on or after July 1 of the performance year."  (Doc. No. 50-27 at 4; Doc. No. 52 at 41).  But as explained above, Orlandi was not terminated or entitled to severance under the CIC Plan.  Therefore, her VICP breach of contract claim must fail.

And second, "[t]he Parties stipulate that a termination of employment by Plaintiff on account of 'Good Reason' as defined in the LTI Awards is a condition that, if met under the LTI Awards and the LTI Plan, will result in Plaintiff having damages with respect to each LTI Award." (Doc. No. 49 at 3).  But the definition of "Good Reason" in the LTI Awards is the same as the definition of "Good Reason" in the CIC Plan.  Therefore, for the reasons stated above, Orlandi's resignation was not for "Good Reason" as defined by the LTI Awards either.  In turn, because Orlandi does not allege there is any other basis for her LTI Plan breach of contract claim, that claim must fail as well.

In sum, because Orlandi's resignation was not for "Good Reason" as defined by the CIC Plan and the LTI Awards, and in turn, because she was not terminated or entitled to severance

23

under the Andeavor Severance Plan, Defendants are awarded summary judgment of her breach of contract claims.

## V.    CONCLUSION

For the foregoing reasons, I grant Defendants' motion for judgment on the administrative record of Orlandi's ERISA claim and summary judgment of her contract claims.  (Doc. No. 50).  In turn, I deny Orlandi's motion for the same.  (Doc. No. 51).  Finally, I deny as moot Defendants' motion to file a sur-reply.  (Doc. No. 56).


So Ordered.


s/ Jeffrey J. Helmick
United States District Judge

24